Filed 4/14/23  In re A.P. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| In re A.P., et al., Persons Coming Under the Juvenile Court Law. | C096933 |
| LASSEN COUNTY HEALTH AND SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. J.P., Defendant and Appellant. | (Super. Ct. No. 2022-JV0073731, J6663) |

J.P. (father) appeals from the juvenile court's jurisdiction and disposition order, including the exit order, regarding the minors Andrew and Aden.[1]  Father contends there was insufficient evidence to support jurisdiction and the court abused its discretion in issuing and fashioning the disposition order.  We will affirm.

---

[1]      Because the minors' first names begin with the same letter, we refer to them by their first names, rather than their initials.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Detention Report and Order*

On February 9, 2022, Lassen County Health and Social Services Agency (the Agency) filed a detention report recommending that the juvenile court assert jurisdiction over Aden, age 10, and Andrew, age nine, and that they remain in the care of L.K. (mother).

The detention report noted, inter alia, that parents were involved in a "high conflict child custody case," have a week on, week off parenting schedule, and were prohibited from drinking alcohol during parenting time with the minors or using corporal punishment as a form of discipline.

The report summarized the minors' welfare history of 21 referrals beginning in 2014, with 10 referrals since January 13, 2020, most of which the Agency determined to be inconclusive based on father's denial that the incidents occurred as reported. The welfare history, however, included two 2016 referrals alleging emotional, sexual, and physical abuse of the minors against father that the Agency determined to be unfounded. On January 28, 2022, the Agency determined a referral against father for general neglect was substantiated.

The juvenile court ordered the minors placed in the custody of mother and supervised visits with father.

B. *Dependency Petition*

Based on the report and as a baseline for the order, the Agency filed a dependency petition against father under Welfare and Institutions Code, section 300, subdivisions (b)(1) and (c).[2]

---

[2]     Undesignated statutory references are to the Welfare and Institutions Code.

Under section 300, subdivision (b)(1), the petition alleged in paragraph b-1 that father "has a history of alcohol abuse and is a frequent abuser of alcohol to the point of intoxication which renders [him] incapable of providing appropriate care of the children. The father leaves the children home alone at night without suitable care providers and operates motor vehicles with the children in the vehicle while intoxicated. The father's abuse of alcohol endangers the children's physical and emotional health and safety and creates a detrimental home environment, placing the children at risk of physical and emotional harm or damage."

The petition further alleged in paragraph b-2 that father "has a history of intimidation and excessive forms of discipline towards the children despite repeated counseling from the [Agency] not to do so, including, but not limited to striking the children on the head, picking them up and throwing them, and threatening harm for speaking to social workers. The father causes the children to be fearful of him by destroying possessions and threatening with statements such as to 'beat them within an inch of their lives.' Such inappropriate conduct on the part of the children's father endangers the children's physical and emotional health and safety and places the children at risk of severe physical and emotional harm, damage and danger."

The petition repeated the allegations in paragraph b-2 as allegations in paragraph c-1 under section 300, subdivision (c).

C. *Jurisdiction Report*

On March 4, 2022, the Agency filed a jurisdiction report setting forth the evidence supporting the alcohol abuse and excessive discipline allegations against father.

Regarding paragraph b-1, the report stated that Aden was interviewed in July 2020 regarding a report that father and his girlfriend, R.N., got in a fistfight on a camping trip while they were both " 'drunk and naked.' " Aden stated that father was " 'very drunk,' " called Aden stupid and pulled his ear, and father said he and R.N. were only " 'talk fighting' " but " 'they were hitting each other.' " Andrew stated he did not see the fight

3

because it sounded scary, so he stayed in the tent. He added, " 'They yell at each other and sometimes punch each other. They once fought naked when I was there.' "

In June 2021, Aden told an Agency social worker that he saw father drink beer when he drove the minors home from a rodeo in Reno. Father told them it was apple juice. Father drove fast and it was scary.

In November 2021, the Agency received a referral that father and R.N. were leaving a party with R.N. driving, when she fell out of the vehicle as it was backing up. R.N. died when the vehicle rolled over her. A police report stated that father was "visibly upset and heavily intoxicated." Father told the officer that he, R.N., and her 18-year-old daughter, C.M., were celebrating a friend's 21st birthday, and "[t]hey all had been drinking heavily and were intoxicated."

In February 2022, an Agency social worker interviewed Aden regarding a referral that, on January 28, 2022, C.M. was intoxicated when she drove Aden to school. Aden stated that he knew C.M. was drunk because " '[s]he said she was, then she said "I drank all night." ' " When asked if father could have driven him to school, Aden answered, " 'I don't want to live at my dad's. I hate him. He hits me and my brother. He drinks and lies about how much he's drinking.' " Aden further stated that he knows when father is drunk, because " '[h]e stutters and stumbles around, breathes heavy. He gets more angry when he's drunk.' " Aden also reported that father called him a " 'Straight A Piece of shit.' " Aden additionally stated father is " 'mean and he hits me and my brother' " and offered as an example that father says, " 'he's going to beat us within an inch of our lives.' " The social worker quoted Aden stating: (1) " '[C.M.] drinks 5 days a week, drinks like a fish' "; (2) father and C.M. drink at a shop next to where R.N. died; (3) " '[C.M.] loves Coors Lite [*sic*]' " and " 'has a fake ID' "; (4) C.M. drinks out of a can but father " 'has to drink his beer out of a cup and tells me its apple juice but apple juice ain't bubbly' "; (5) father drinks from the cup in the car and has driven the minors while intoxicated many times, including when father " 'drove drunk with me on New

4

Year's Eve,' " and was " 'stumbling around' "; and (6) Aden " ' can tell when [father]'s drunk because he calls me dude. I hate that.' "

Aden further reported that father sometimes leaves Aden and his brother with R.N.'s other daughters, ages 16, 14, and 11, or by themselves. Aden stated that one time he called father crying because " 'the dogs were barking and it sounded like someone was outside.' " Aden recalled another time when Andrew was throwing up while they were by themselves. Aden called father, who said to give Andrew some water and he would be fine. Aden called his mother because Andrew was still throwing up, and she stayed on the phone with them all night.

When the social worker asked if father was drinking less, more, or the same since R.N. died, Aden answered: " 'I'd say about the same. They would get drunk all the time too, but now it's just him by himself since she died.' " Aden recalled father coming home drunk the night R.N. died and waking Aden to tell him, " 'Mommy had died,' " which Aden took to mean his mother had died and he started crying.

Aden also told the social worker: " 'If dad hurts me I tell mom but if dad hurts Andrew he tells me to leave the room and Andrew doesn't tell mom because he is scared she is going to tell dad.' "

When interviewed by an Agency social worker on February 6, 2022, father denied C.M. drove Aden to school while intoxicated, stating this was impossible because " '[C.M.] is not yet 21 and doesn't drink at all.' " Father denied driving the minors while intoxicated, stating that he was " 'drinking Monsters,' " which the minors believed to be beer. Father stated that mother tells the minors to say things in order to take custody from father. Father denied all allegations of intoxication and inappropriate discipline, stating that in the past 18 months, he had not consumed alcohol when the minors were with him. Father confirmed that he had the minors with him on November 5, 2021, when R.N. died, but said he was unaware of a police report describing him as " 'heavily intoxicated.' " Father stated this report was not sufficient proof of his intoxication

5

because he was not given a breathalyzer test. He then stated that the minors were actually at his grandmother's house. Asked about an incident on December 14, 2021, where the minors were fighting and father hit Andrew (who has a history of brain hemorrhages and mild cerebral palsy) on the head " 'over and over,' " father recalled the boys fighting but not his hitting Andrew because " 'I must have been so drunk I don't remember.' "

On February 16, 2022, an Agency social worker interviewed Andrew, who unprompted said he was now willing to talk because he did not have to go to his father's. Andrew reported an incident where father threw him into a door. Andrew stated that father is not supposed to drink, but " 'drinks all the time,' " and tells the minors not to tell mother.

That same day the social worker spoke to Aden, who reported being upset when father sounded drunk on the phone and would not let Aden end the call. Aden said he knew father was intoxicated because he " 'was stuttering and breathing heavy.' " Aden expressed doubt that father could get help: " 'He can't stop drinking, it's hard for him not to drink. He drinks until 5 a.m. He's like a fish but instead of living in water he lives in beer.' "

On February 18, 2022, before a supervised visit with the minors, father provided a urine sample that tested positive for alcohol metabolites. Father explained to an Agency social worker that he had had a " 'beer the night before' " the visit. Regarding the police report indicating that he was drunk the night R.N. died, father stated he had " 'just opened a beer because my wife died.' " Father denied having a problem with alcohol or consuming alcohol when the minors are with him, and rejected the social worker's offer of services to control his alcohol consumption.

The jurisdiction report set forth evidence in support of allegations in paragraph b-2 of intimidation and excessive discipline by father, as follows.

6

In January 2020, an Agency social worker interviewed Andrew and Aden about a referral alleging Andrew said father " 'slammed me on the ground and [R.N.] hits me all the time.' " Andrew reported that father and R.N. " 'smack me in the back of the head' " and father twists Andrew's arms and pushes his head down on the table. Andrew also reported that father purposely broke his toys and laughed about it. However, the social worker noted no physical marks on the minors.

In April 2020, Andrew told an Agency social worker investigating a bruise to his ear that father " 'grabbed me by my ear and banged me into the car seat.' " Mother called the police alleging that father physically abused Andrew. Father stated his belief that a red mark on Andrew's ear was caused by a helmet he was wearing while riding an ATV. Mother reported that Andrew was supposed to avoid activities with a risk of head injury, because of his brain injury due to prenatal complications.

In December 2020, both Aden and Andrew told an Agency social worker that father had picked up Andrew by his shirt and slammed him into a door.

This allegation and evidence is repeated in paragraph c-1.

On April 12, 2022, father's counsel filed hearsay objections to minors' statements in the jurisdiction report. Father contended that the minors' statements were unreliable because they were the product of fraud, deceit, or undue influence by mother, citing section 355, subdivision (c)(1)(B).

D. *Jurisdictional Hearing*

On May 10, 2022, the juvenile court conducted a contested jurisdictional hearing. The court admitted the jurisdiction report as evidence. The Agency, mother, and counsel for the minors offered no additional evidence and submitted on the report. Father's counsel moved to dismiss under section 350, subdivision (c) on the ground that the jurisdiction report was insufficient to establish jurisdiction. Counsel also moved to strike hearsay statements in the report. The juvenile court denied both motions.

7

Father called Agency social worker, Tiffany Sherman, as a witness. Father's counsel elicited testimony that father was never pulled over or arrested for drinking and driving while the minors were in the car. In the course of Sherman's testimony, the court sustained a hearsay objection to Aden's report of C.M.'s statement that she stayed up all night drinking. Sherman confirmed that Aden had never gone to the hospital as a result of injuries inflicted by father, and the minors' teachers never reported physical injuries from inappropriate discipline.

The next witness, Justin Lindsey, attended a birthday party on the night R.N. was killed in a car accident. Aden and Andrew were there until 9:00 p.m. when father's mother picked them up. Lindsey saw the vehicle roll over R.N. Lindsey testified that father was not heavily intoxicated at the time. Father was not slurring his words or staggering. Lindsey did not see father drinking until after the accident. Lindsey testified that father drinks a beer or two, but Lindsey has never seen him drunk.

C.M. testified that she does not drink alcohol and the statement that she drinks five days a week is not true. She has driven Aden and Andrew to school but has never done so while intoxicated. When C.M. drives the boys to school she drinks an energy drink or Gatorade, but not alcohol. C.M. testified she does not have a fake I.D. and the minors have never seen her with a fake I.D. She further testified that she has never seen father use excessive discipline on his sons.

On cross-examination, when shown photos of herself posted on her Facebook account holding or drinking alcoholic drinks, including a July 2021 profile photo of her holding a can of Coors Light, C.M. retracted her testimony that she did not drink alcohol.

Joe Arminas testified that father worked on his crew as an equipment operator at the military base recycling center. Arminas testified that if someone on his crew reported for work drunk he would be fired immediately. Arminas has never seen father come to work drunk or smelled alcohol on him. Arminas testified that he has lunch with father every day and has never seen him drink alcohol.

Kimberlynn Thresher testified that she encountered father at the Reno rodeo. She spent the whole day with father with the minors present and saw father drink only lemonade. She never saw him put alcohol in a lemonade cup. Thresher has not seen father drink alcohol when his children were present.

Dina Maria Schmitt testified she lived for six weeks in the same house as mother, who is her stepsister. Schmitt testified that when the minors returned from father's house mother "grilled" them about what happened. Mother asked questions until the minors' story changed from what actually happened. Schmitt testified the minors were being coached.

Father testified next. Father denied the conduct attributed to him in the jurisdiction report. He denied: fighting with R.N. while drunk and naked on a camping trip; pulling Aden's ear and calling him stupid; leaving the minors home alone by themselves; driving the minors while intoxicated; that C.M. took the minors to school while intoxicated; lying about how much he drinks; calling the minors on the phone while drunk; getting angry when drinking; calling Aden "a straight A piece of shit"; using excessive discipline; drinking beer out of a cup to hide it from the minors; drinking on New Year's Eve, stating he "never had a single beer that night," and was not stumbling around; driving the minors fast back from the Reno rodeo while intoxicated; drinking all night, explaining that he has to get to work at 6:30 a.m., likes to get there early, and would be fired if showed up drunk or smelling of alcohol; throwing the minors into a wall when they were fighting; using a cup to hide alcohol from the minors or calling beer apple juice; slamming Andrew to the ground in January 2020 or that R.N. hit them; breaking the minors' toys; smacking Andrew in the back of the head or that R.N. did; twisting Andrew's arm or picking up Aden by the ears and throwing him; and striking Andrew in the face in December 2021.

9

Father testified he has told the minors he would beat them within an inch of their lives when they talk about doing something dangerous, like driving his truck or grabbing a gun.

Father sometimes calls Aden or Andrew "dude," but he has never heard a comment about it until they were taken away from him.

Father recalled an incident where the minors were crying because a dog was barking and they thought someone was outside. C.M. was home and father was at the shop working on a truck. Father told the minors he would be back at a reasonable hour. When he got home, the minors were scared, but C.M. did not know why. Father believed it was because they watched a horror movie.

Father denied that he was heavily intoxicated the evening R.N. died. Father attended a birthday party at the Lindseys' shop. When father and R.N. were leaving the party, father was sober, and R.N. had not had anything to drink in several hours. They had an argument about who should drive home. R.N. said she hadn't driven the Excursion in a while and wanted to drive it. R.N. put the truck in reverse instead of park, stepped out, and got dragged under the truck. Father did not see her get dragged under the truck. He ran around and put the truck in park, and then saw her in the middle of the driveway. Father started CPR.

Regarding the investigation in April 2020 of the bruise on Andrew's ear, father testified that Andrew got mad at C.M. and hit her several times. When father asked him to come here and he wouldn't, father grabbed Andrew by the ear. When a bruise on his ear was reported, father believed it was because he had been taking a helmet on and off while riding an ATV. Father denied banging Andrew's head into the car seat.

On cross-examination, father testified that he tested positive for alcohol on February 18, 2022, because he had two beers the night before with a friend. He testified he had never seen C.M. drink and that she was trying to look cool in the photos on Facebook.

10

Father testified that under the family law order he could not be intoxicated around the minors, but he could have one beer.  Because of the allegations against him, he had not had a beer around the minors in probably a year and a half.

The juvenile court found that jurisdiction was established by a preponderance of the evidence.  The court stated it did not find C.M. to be a credible witness.  The court also found the testimony of father's supervisor and others of limited value, because they did not know the circumstances of father's conduct with the minors.  The juvenile court found it significant that the police report stated that father was heavily intoxicated the night R.N. died and, in light of the report, questioned the credibility of father's testimony that he did not drink that night.  The court also questioned the credibility of father's explanation for the positive alcohol test before a visitation.  The court concluded that the "bottom line is I believe the children . . . they're telling the truth."

The juvenile court found the allegations of the dependency petition to be true and sustained the petition.  The court found that the minors come under section 300, subdivisions (b) and (c).

E.  *Disposition Hearing and Order*

On April 20, 2022, the Agency filed disposition reports for Aden and Andrew recommending the minors be declared dependents of the juvenile court, mother be granted custody of the minors, and juvenile dependency terminated.  The Agency further recommended that father have visitation with the minors twice a month under supervision by a family counselor, until father purchases a breathalyzer and provides a negative sample for alcohol two hours before an unsupervised visit.

After receiving and reviewing the briefing by counsel for the parties, on August 8, 2022, the juvenile court conducted a disposition hearing.  The court admitted the Agency's disposition reports as evidence.

11

Pursuant to sections 361 and 361.2, the juvenile court placed the minors with mother as the nonoffending noncustodial parent.[3] The juvenile court then terminated dependency jurisdiction and issued an exit order that gave sole legal and physical custody of the minors to mother, finding continued custody by father contrary to the minors' welfare.

With respect to visitation, the juvenile court made the following findings and order: "[Father] requires therapeutic visitation with the children, Aden and Andrew, due to unameliorated issues of excessive discipline, intimidation, threats to the children, and parenting while under the influence of alcohol, resulting in the children being fearful and being placed in detrimental situations by the father.

"[Father] shall have visitation with the children, Aden and Andrew, a minimum of twice each month for a minimum of 30 minutes each visit. Therapeutic visits will be supervised by the children's therapist or another licensed therapist or counselor who coordinates with the children's therapist. Visits may be terminated early by the supervising therapist if any action by the father causes either child detriment during the session. It is the father's responsibility to establish a regular schedule for therapeutic visitation and to pay any fees or copays for such. It is the mother's responsibility to ensure that the children are present for regularly scheduled appointments."

---

[3] Section 361.2 provides that if removal is ordered, the court shall place the child with the parent who desires custody and did not have custody during the events or conditions that brought the child within section 300 jurisdiction, unless such placement would be detrimental to the safety, protection, or physical or emotional well-being of the child. (§ 361.2, subd. (a).) The court may order that the nonoffending parent have legal and physical custody of the child and reasonable visitation by the noncustodial parent. (§ 361.2, subd. (b)(1).) In this instance, mother was the nonoffending noncustodial parent with respect to the 50 percent of the time that father had custody of the minors.

DISCUSSION

I

*Jurisdiction*

Father contends the juvenile court's jurisdiction order was not supported by substantial evidence.

With respect to section 300, subdivision (b), father specifically argues that: (1) the statute does not provide for jurisdiction based on emotional harm; (2) the juvenile court's findings were based on statements contained in the jurisdiction report, as the minors did not testify; and (3) several of the incidents occurred in the past.

The standard of review we apply under section 300, subdivision (b) is familiar. " '[B]efore courts may exercise jurisdiction under section 300, subdivision (b) there must be evidence "indicating the [minor] is exposed to a substantial risk of serious physical harm or illness." ' [Citations.] [¶] The purpose of section 300 is to protect children from parental acts or omissions that place them at a substantial risk of suffering serious physical harm or illness. (§§ 300, subd. (b), 300.2.)" (*In re A.F.* (2016) 3 Cal.App.5th 283, 289.)

"Our review of the sufficiency of the evidence is limited to whether the judgment or order is supported by substantial evidence. 'Issues of fact and credibility are questions for the trial court and not the reviewing court. The power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact.' " (*In re A.F., supra*, 3 Cal.App.5th at p. 289.)

We conclude there is ample evidence to support the jurisdictional findings that father is an alcohol abuser who puts the minors at risk by driving the minors while intoxicated, leaving them at home without proper supervision, engaging in domestic violence in the minors' presence, and physically abusing the minors. While undoubtedly father's alcohol abuse caused the minors emotional harm, it also put them at risk of

13

physical harm.

Specifically, in July 2020, both Aden and Andrew described father and his girlfriend R.N. striking each other during drunken fights. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193 [risk of harm established where minors exposed to violent confrontations between father and stepmother], abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628.) Aden reported that in June 2021 father drank beer as he drove them home from the Reno rodeo so fast it was scary. (*In re M.R.* (2017) 8 Cal.App.5th 101, 109 [substantial evidence supported jurisdiction where mother while intoxicated drove 80 miles an hour with children in the car].) Aden also stated that father has driven while drinking alcohol from a cup in the car so many times it was hard to pick one occasion, but then recounted a New Year's Eve where father drove drunk and was " 'stumbling around.' " (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022 [past incident of parents drinking and driving placed "children at substantial risk of serious physical harm"].) The police report regarding the November 2021 accident that claimed the life of R.N. described father as " 'heavily intoxicated.' " Both father and C.M. testified at the jurisdictional hearing that she was underage and did not drink, a claim C.M. abandoned when shown multiple photos of her holding and drinking alcoholic beverages. After the petition was filed, prior to a visitation with minors — during which father acknowledged he was required to be alcohol-free by court order — urinalysis disclosed alcohol metabolites, which father attributed to having a beer the night before. Yet father minimized his alcohol consumption and continued to deny C.M.'s alcohol consumption. (*In re M.R.*, at p. 109 [parents' minimization of mother's conduct, maintaining she had consumed one or two beers despite evidence of significant intoxication, called into question their judgment].) Lastly, Aden described multiple times when father left the children at home without appropriate supervision, rejecting their requests to come home. (See *In re K.B.* (2021) 59 Cal.App.5th 593, 602-603 [affirming dependency jurisdiction over children regularly left unsupervised].) This evidence is more than sufficient to

14

support the juvenile court's jurisdictional finding.

We need not consider father's claim that the evidence was insufficient because the minors did not testify at the contested hearing and the juvenile court relied on statements in the jurisdiction report. Father does not contend on appeal that the juvenile court erred in admitting the jurisdiction report containing the minors' statements to Agency social workers. (§ 355, subd. (c)(1)(B) [hearsay statement in jurisdiction report of the declarant under 12 years of age is admissible unless the objecting party establishes the statement is the product of fraud, deceit, or undue influence].)

We reject father's suggestion that the evidence was insufficient because it included past incidents. "Although there must be a present risk of harm to the minor, the juvenile court may consider past events to determine whether the child is presently in need of juvenile court protection. [Citation.] The California Supreme Court has observed that, depending upon the circumstances, a 'past failure [can be] predictive of the future.' " (*In re A.F., supra*, 3 Cal.App.5th at p. 289.) "The court need not wait for disaster to strike before asserting jurisdiction. [Citation.] This is why the statute uses the word 'risk.' " (*In re K.B., supra*, 59 Cal.App.5th at p. 603.) Since at least 2020, the minors' reports of father's alcohol abuse have been frequent and appear to be accelerating in frequency. As mentioned, father also tested positive for alcohol after the petition was filed. Moreover, father consistently refused to acknowledge that his alcohol use affects his parenting and rejected an offer of services to address his alcohol use. (*Id.,* at p. 605 ["A court is entitled to infer past conduct will continue where the parent denies the problem."].) The evidence of past events strongly indicates that father's alcohol use will be harmful to the minors in the future.

We conclude the jurisdictional finding in paragraph b-2 of intimidation and excessive discipline is also supported by substantial evidence. In January 2020, Andrew reported that father and R.N. "smack me in the back of the head," and father twists his arms and pushes his head down towards the table. Because of a prenatal brain injury,

15

Andrew must avoid activities that risk a head injury. Yet Andrew reported that father grabbed him by the ear and banged his head on the car seat. In the same interview, Aden stated that father once picked him up by the ears and threw him. Father admitted he pulled Aden by the ear. In December 2020, both minors reported that father picked Andrew up by the shirt and slammed him into a door. Aden related father's excessive discipline to his alcohol use. Father continues to deny any intimidation or excessive discipline, indicating this conduct will persist into the future. In sum, the trier of fact was entitled to believe the detailed accounts of the children over the general denials of the father. The evidence is sufficient to support the court's jurisdictional finding.

Father also claims the juvenile court's findings under section 300, subdivision (c) are not supported by substantial evidence. "A child comes within the jurisdiction of the juvenile court under subdivision (c) of section 300 if . . . the child is at '*substantial risk* of suffering serious emotional damage, evidenced by *severe anxiety*, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . .' " (*In re D.B.* (2020) 48 Cal.App.5th 613, 620-621.)

We need not reach this claim. " ' "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence." ' " (*In re A.F., supra*, 3 Cal.App.5th at p. 289.) Given the ample evidence supporting jurisdiction under subdivision (b) of section 300 and the fact that the jurisdiction report relies on the same allegations and evidence for subdivision (c) as subdivision (b), we decline to exercise our discretion to reach the merits of father's challenge to the juvenile court's jurisdictional findings under subdivision (c). (*In re A.F.,* at p. 289.)

We conclude that substantial evidence supports dependency jurisdiction.

II

*Dispositional Order*

Father contends the juvenile court abused its discretion in fashioning its exit order by giving mother sole legal and physical custody of the minors and permitting the minors' therapist to terminate a supervised visit if the visit becomes detrimental to the minors. These claims lack merit.

When a juvenile court terminates its jurisdiction over a dependent child, it may issue family law orders governing custody or visitation, commonly known as "exit orders." (§ 362.4, subd. (a); *In re Kenneth S., Jr.* (2008) 169 Cal.App.4th 1353, 1358.) Exit orders remain in effect unless terminated or modified by a family law court. (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1123.) When terminating jurisdiction and issuing custody orders, the juvenile court must consider the best interests of the child. (*In re John W.* (1996) 41 Cal.App.4th 961, 973.) " 'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion.' " (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.)

Father suggests that the juvenile court should not have assumed jurisdiction and issued an exit order, but rather should have allowed this case to remain in family court and issued "a temporary order to maintain the status quo on custody and visitation pending follow up by the family court." We have already determined that father's challenge to the juvenile court's assumption of jurisdiction is without merit. Moreover, father assumes that this case was nothing more than a custody battle, citing *In re John W., supra*, 41 Cal.App.4th at page 976, in which the court observed "the place for a custody battle is in the family law courts." (Fn. omitted.) However, the evidence presented at the jurisdictional hearing established that father's alcohol abuse and excessive discipline placed the minors at risk. There were no allegations of abuse against mother. The concern expressed in *In re John W.,* at page 975, that " 'juvenile courts must not become

17

a battleground by which family law war is waged by other means,'. . . must give way to the primacy of dependency court jurisdiction and its special role," where, as here, the Agency is able to prove that dependency jurisdiction is warranted. (*In re Nicholas E.* (2015) 236 Cal.App.4th 458, 466.)

Father next contends that the juvenile court "lacked sufficient evidence to support a finding that sole legal custody to Mother was in Aden and Andrew's best interest." " 'Sole legal custody' means that one parent shall have the right and the responsibility to make the decisions relating to the health, education, and welfare of a child," as opposed to "joint legal custody" where both parents share that right. (Fam. Code, §§ 3003, 3006.) Section 361.2 expressly provides if the juvenile court places a child with a nonoffending noncustodial parent, as here, it may "[o]rder that the parent become legal *and* physical custodian of the child." (Italics added.) (§ 361.2, subd. (b)(1).) Thus, there is no presumption in favor of joint legal custody where the court orders physical custody to a nonoffending parent, in fact to the contrary. (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1134; *In re Jennifer R.* (2011) 14 Cal.App.4th 704, 713.) Moreover, there was ample evidence supporting the court's award of sole legal custody to mother, not only because father's decision-making was impaired by his habitual abuse of alcohol, but also due to his blanket refusal to acknowledge his problematic behavior. Father attributed every incident documented in the jurisdiction report to mother's coaching the minors to take custody away from him, as well as denying, despite overwhelming evidence to the contrary, that he had tasked C.M., an underage alcohol drinker whom the juvenile court expressly found to be not credible, with driving Aden to school. In that respect, father's inability to participate in decision-making in the minors' best interest, let alone cooperate with mother to that end, was manifest. Should circumstances change in the future, father may seek joint legal custody in the family law court. (*In re Jennifer R.*, at p. 714.)

Finally, we reject father's claim that the juvenile court improperly delegated judicial authority by vesting the supervising therapist with discretion to terminate father's

18

visits if father causes detriment to the child. To be sure, an order prohibiting a father from visitation with his children without the permission of the children's therapists is an unlawful delegation of judicial authority. (*In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1478.) However, the frequency and length of visits are aspects of time, place, and manner of visitation that may be properly delegated. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1376-1377; *In re Christopher* (1996) 50 Cal.App.4th 1001, 1008.)

We note that in an April 2022 visit, Aden became "visibly upset" during a visit when father continued to deny that he drank alcohol and hit the minors, leading the supervising social worker to end the visit. Accordingly, the juvenile court issued a detailed visitation order that specified the frequency and minimum duration of father's supervised visits, while giving the supervising therapist flexibility to end a particular visit where father's conduct becomes detrimental to the minors. The order did not delegate to the therapist the discretion to reduce or terminate father's visitations generally, but only afforded the therapist limited discretion to address the well-being of the minors during a visit. (See *In re Moriah, supra*, 23 Cal.App.4th at pp. 1374-1375 [juvenile court permissibly delegated to child protective services discretion "to 'arrange for, and monitor visitation'. . . 'consistent with the well-being of the minor[s]' "]; see also *In re C.S.* (2022) 80 Cal.App.5th 631, 640-641 [where mother's verbal abuse triggered traumatic emotions in daughter, order granting visitation and expressly stating the frequency and duration of visits did not impermissibly delegate authority to a therapist to determine when it was safe for visits to begin].)

In sum, the visitation order did not constitute an unlawful delegation of judicial authority.

DISPOSITION

The juvenile court's jurisdiction and disposition order, including the exit order, are affirmed.

_____\s\_____,
McADAM, J.*

We concur:

_____\s\_____,
DUARTE, Acting P. J.

_____\s\_____,
BOULWARE EURIE, J.

---

*        Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20